UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x

MARIA CIOFFI KRAUSE and
JANE MEROLLA,

                         Plaintiffs,

                 - against -

EIHAB HUMAN SERVICES, INC., and
FATMA ABBOUD,

                        Defendants.
-------------------------------------------------------- x

**MEMORANDUM & ORDER**

10 CV 898 (RJD) (SMG)

DEARIE, District Judge

        Plaintiffs Maria Cioffi-Krause and Jane Merolla (together, the "Plaintiffs") are former employees of defendant Eihab Human Services, Inc. ("Eihab"), a not-for-profit organization that provides services to individuals with developmental disabilities. Defendant Fatma Abboud (together with Eihab, the "Defendants") is the founder, executive director, and chief executive officer of Eihab.

        On March 1, 2010, Plaintiffs filed a *qui tam* complaint against Defendants, under seal, alleging, *inter alia*, that Defendants had asked Eihab employees to fraudulently recreate missing billing records during a state agency audit. Krause was terminated two months later, on May 3, and Merolla was terminated five months after that, on October 26. The underlying *qui tam* action settled in 2013.

        Defendants now move for summary judgment on Plaintiffs' remaining claims: (1) termination in violation of the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), and its state law counterpart, the New York False Claims Act, N.Y. State Fin. Law § 187, *et seq.* ("New York FCA"); (2) interference with Merolla's rights under the Family Medical Leave Act, 29 U.S.C. § 2615(a)(1) ("FMLA"); (3) interference with

Plaintiffs' rights under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1140 ("ERISA"); and (4) breach of contract. For the reasons stated below, Defendants' motion for summary judgment is granted in part.

BACKGROUND

Eihab is a not-for-profit agency that provides services to individuals with developmental disabilities in New York, New Jersey, and Pennsylvania. Defs.' Statement of Undisputed Facts Pursuant to Local Rule 56.1, ECF No. 61 at ¶ 7 [hereinafter Defs.' 56.1 Statement]. In New York State, Eihab is regulated by the Office for People with Developmental Disabilities (the "OPWDD"), which subjects agencies like Eihab to financial reviews, known as "limited fiscal reviews." Id. at ¶¶ 9, 10; Pls.' Response to Defs.' Statement Pursuant to Local Rule 56.1, ECF No. 70 at ¶ 10 [hereinafter Pls.' 56.1 Statement].

A. The OPWDD Audit

On February 10, 2009, the OPWDD informed Eihab that it would be subjected to a limited fiscal review, to be conducted by the private accounting firm Wei Wei, & Co., LLP ("Wei Wei"). Defs.' 56.1 Statement at ¶ 12. At the time, Krause was the director of Human Resources at Eihab, a position she had held for almost two years, and Merolla, who had been employed at Eihab in a full or part time capacity since 2001, was Eihab's associate executive director, a position she had held since 2006. Id. at ¶¶ 14, 17, 19-20.

Plaintiffs testified that, on March 17, 2009, an Eihab employee, Elizabeth Adelaja, came to Krause in a very agitated state. Pls.' 56.1 Statement, Ex. 1 at 81-83 (Merolla deposition); id., Ex. 2 at 93-95 (Krause deposition). Adelaja told Krause that Abboud had asked her to fraudulently recreate missing billing records that Eihab was required to give the Wei Wei auditors to support services that Eihab had billed to Medicaid. Id., Ex. 1 at 83, 88; id., Ex. 2 at

94-95. Adelaja had refused to do so and feared retaliation. <u>Id.</u>, Ex. 1 at 88; <u>id.</u>, Ex. 2 at 95. Krause notified Merolla of the situation, who then also spoke with Adelaja. <u>Id.</u>, Ex. 1 at 82-83; <u>id.</u>, Ex. 2 at 100-01.

Together, Krause and Merolla decided that they should have Adelaja speak with the auditors, some of whom were in the office that day. <u>Id.</u>, Ex. 1 at 84-86; <u>id.</u>, Ex. 2 at 103-04. Krause spoke briefly on the phone with the Wei Wei audit team leader, Charlie Xiao, before letting Adelaja explain further. <u>Id.</u>, Ex. 2 at 104, 106-07. Merolla, though present for at least part of the conversation, did not speak with the auditors. <u>Id.</u>, Ex. 1 at 99-100.

Plaintiffs testified that two other Eihab employees—George Bramwell and Ahlam Hammad—were also present, speaking to the auditors about similar requests by Abboud that they recreate missing billing documents. <u>Id.</u>, Ex. 1 at 99-100; <u>id.</u>, Ex. 2 at 104-05. Ultimately, neither Adelaja, Bramwell, nor Hammad was willing to provide a written statement supporting the Plaintiffs' story. <u>Id.</u>, Ex. 2 at 113, 122. In fact, Bramwell and Hammad both denied that Abboud ever asked them to recreate missing documents. <u>Id.</u>, Ex. 5 at 39 (Bramwell deposition); <u>id.</u>, Ex. 40 (Hammad statement). Nonetheless, both Bramwell and Hammad agree that some version of this meeting occurred in early 2009 and that Plaintiffs tried to persuade them to make statements to the auditors by assuring them that if they were fired for making this report they could sue Abboud for a million dollars. <u>Id.</u>, Ex. 5 at 39-41, 64-65; <u>id.</u>, Ex. 40. Furthermore, Bramwell admitted that there were some daily, weekly, and monthly notes missing from Eihab's service records and that, over the course of the audit, there developed two "factions" regarding these missing documents—with Krause, Merolla, and Adelaja on one side, and Abboud on the other. <u>Id.</u>, Ex. 5 at 12-13, 19-21. Bramwell testified that Adelaja eventually "gave in because she was under pressure . . . from . . . Abboud," and told Bramwell, Hammad, and other staff to

recreate the missing notes. Id. at 19-21, 72-73. Plaintiffs claim that this reversal was due to fear

of retaliation and that Adelaja received a $10,000 bonus for changing her story. Id., Ex.2 at 113;

id., Ex.11 at 12 ¶ 17 (Merolla interrogatories response).

 Over the next months, Plaintiffs sent Xiao, the lead Wei Wei auditor, several emails

following up on the billing fraud allegations and informing him of other suspected improper

conduct at Eihab.[1] Id., Exs. 29-33. Ultimately, the auditors rejected a few documents, explaining

to Abboud "off the record," that the auditors deemed the documents to be "recreated or created."

Id., Ex. 10 at 151-52 (Xiao deposition).

### B. Subsequent Harassment of Plaintiffs

According to Plaintiffs, Abboud quickly made clear her displeasure with their report to

the Wei Wei auditors, retaliating against Plaintiffs in a number of ways.

For Krause, these include Abboud (1) accusing Krause (and Merolla) of forcing Adelaja,

Bramwell, and Hammad into reporting to the auditors, Pls.' 56.1 Statement at ¶ 162, (2) denying

Krause a raise, id. at ¶ 230, (3) threatening to fire Krause, id. at ¶ 232, (4) removing personnel

files from Krause's office necessary for Krause to perform her job duties, id. at ¶ 235, and

(5) instructing Merolla to "find a reason" to terminate Krause, id. at ¶ 236.

---

[1]      In addition to the March 17, 2009, report, Plaintiffs claim that they engaged in several
other "protected acts" under the anti-retaliation provisions of the FCA and the New York FCA.

Krause's additional alleged protected conduct includes (1) an April 6, 2009,
memorandum she wrote to Abboud seeking a salary increase, (2) an August 19, 2009, letter from
Krause's attorney brother-in-law, outlining salary issues and unfair disciplinary actions taken
against Krause, and (3) complaints about the hiring of Abboud's financially illiterate sister into
Eihab's accounting department. Pls.' 56.1 Statement at ¶ 36.

Merolla's additional alleged protected conduct includes (1) emails to various OPWDD
employees in 2009, regarding retaliation against Merolla for reporting the alleged billing fraud,
(2) complaints in June and July of 2010 to Eihab's board of directors about billing issues at
Eihab's Pennsylvania office, (3) complaints to a Pennsylvania county agency in August of 2010
about billing issues at the Pennsylvania office, (4) reports to the OPWDD regarding the hiring of
Abboud's sister, and (5) a meeting with a New York congressman to discuss the OPWDD's
oversight of Eihab, resulting in a congressional investigation into the OPWDD. Id. at ¶ 50.

For Merolla, these include Abboud (1) offering Merolla a raise if she "would stop working against [Abboud] with the State," (by which Plaintiffs argue Abboud meant the OPWDD), <u>id.</u> at ¶¶ 163-65, 167, or submit a written statement denying the allegations, <u>id.</u> at ¶¶ 167, 204, 206, (2) denying Merolla a promised raise and giving her only 40% of a staff bonus because Merolla "shouldn't have turned [Abboud] in to the State," <u>id.</u> at ¶ 169-70, 207, (3) stating, according to draft minutes from a meeting with Eihab's board of directors—later edited to remove this quote—that she "should have fired . . . Merolla when she reported to the State that [Eihab] w[as] forging documents," <u>id.</u>, Ex. 48 at 6, (4) demoting Merolla and reassigning her to Eihab's Pennsylvania site, <u>Pls.' 56.1 Statement</u> at ¶ 201, (5) depriving Merolla of necessary office items, <u>id.</u> at ¶ 202, and (6) denying Merolla access to billing materials, necessary for Merolla to investigate suspected fraud in the Pennsylvania office, <u>id.</u> at ¶ 209.

C.  <u>Termination of Plaintiffs</u>

Krause went on medical leave at the beginning of March, 2010. <u>Defs.' 56.1 Statement</u> at ¶ 110. When she returned two months later, on May 3, 2010, Abboud fired her. <u>Id.</u> at ¶¶ 14, 110.

According to Defendants, Krause was terminated for failing to follow OPWDD employment regulations regarding criminal background check procedures. <u>Id.</u> at ¶¶ 69-95. Defendants state that the investigation began after the OPWDD raised an issue regarding fingerprinting records at an Eihab services site, <u>id.</u> at ¶ 78, but Krause notes that the auditors made no findings with respect to Eihab's criminal background check procedures in their limited fiscal review report and there is no evidence of any such issue being raised by the OPWDD, <u>Pls.' 56.1 Statement</u>, at ¶78 and Ex. 22 at 3 ¶ 5 (draft limited fiscal review report). Additionally, Krause states the procedures she allegedly failed to follow may not have been required for the employees at issue. <u>Pls.' 56.1 Statement</u> at ¶ 73. Furthermore, Merolla testified that the

investigation into Krause's work only began after Abboud instructed Merolla to "find a reason" to fire Krause, and Merolla concluded that there was no basis to do so. <u>Id.</u>, Ex. 1 at 329-331.

Merolla went on medical leave in August of 2010, because of a heart condition. <u>Pls.' 56.1 Statement</u> at ¶¶ 116, 276. When she returned on October 26, 2010, Abboud fired her. <u>Defs.' 56.1 Statement</u> at ¶ 109.

According to Defendants, Merolla was terminated for two acts of "misconduct." <u>Pls.' 56.1 Statement</u>, Ex. 55 (termination memo). First, Defendants claim that Merolla filed a wage violation report with the Pennsylvania Department of Labor on behalf of two Eihab employees, despite knowing that the unpaid wages were due to a fax machine error and that the deficit would be corrected at the next pay period. <u>Id.</u>; <u>Affidavit of James P. Clark</u>, ECF No. 62 [hereinafter <u>Defs.' Affidavit</u>], at Ex. P (Eihab investigation report); <u>Defs.' 56.1 Statement</u> at ¶¶ 96-101. Merolla contends that Abboud had intentionally withheld the compensation—because she suspected the employees were billing personal gas mileage—and that Merolla did not know that the issue was corrected when she reported it. <u>Pls.' 56.1 Statement</u> at ¶¶ 96-101.

Second, Defendants claim that Merolla was implicated in an investigation into a billing issue at Eihab's Pennsylvania office. <u>Pls.' 56.1 Statement</u>, Ex. 55; <u>Defs.' Affidavit</u>, Ex. Q (Eihab investigation report). In August of 2010, Eihab received a letter from the OPWDD regarding time sheets submitted by an Eihab Pennsylvania direct care worker, Natalie Lucke. <u>Defs.' Affidavit</u>, Ex. Q at 1. Eihab conducted an internal investigation into the Lucke matter and concluded that Lucke had attempted to bill for services that she had not provided, supporting these fabricated hours with forged time sheets. <u>Id.</u> at 2. Defendants claim that Merolla had negligently signed off on these time sheets, despite knowing that they could not be verified, and later reported the fraud to local Pennsylvania authorities without first sharing her concerns with

Abboud. Id. at 3.  Merolla denies these allegations, stating that she had been instructed to investigate the Lucke matter but Abboud had denied her access to the necessary billing documents. Pls.' 56.1 Statement at ¶ 105; id., Ex. 53 at 2 (letter from Merolla to Eihab's human resources department).

   D.  Contact during Merolla's FMLA Leave

   On September 22, 2010, Merolla received an email from an employee in Eihab's Human Resources department, informing Merolla that she was being placed on suspension, without pay, pending completion of Eihab's investigation into the Lucke time sheets. Pls.' 56.1 Statement, Ex. 52 (Human Resources email to Merolla). Despite knowing that Merolla was on FMLA leave, at the time, Eihab requested that Merolla participate in the investigation, informing Merolla that she could arrange for an in-person interview at Eihab or speak with the investigator by phone. Id. Three days later, on September 25, 2010, the investigator completed a confidential report, concluding—without having spoken with Merolla—that Merolla had "contributed to the fraud," through her negligence and then "intentionally sabotaged and defamed" Eihab by not giving them the opportunity to self-disclose. Defs.' Affidavit, Ex. Q at 3.

   On September 30, 2010, Merolla sent a written response, objecting to being forced to participate in the investigation (either in person or by phone), because (1) she had not yet been cleared by her physician to work from home in any capacity, and (2) she had been advised by her legal counsel that Eihab could not require her to perform work-related activities while on medical leave. Pls.' 56.1 Statement, Ex. 53. Nonetheless, Merolla's response went into great detail why the accusations against her were false. Id.

E.  Health Insurance and Pension Deprivations

Krause states that, five months after firing her, Eihab terminated her COBRA and dental coverage, reinstating the coverage only after being contacted by Krause's attorney. Id. at ¶ 285.

Merolla claims that Eihab failed to enroll her for dental coverage and did not inform her when this coverage was reinstated, denying her the benefit of the coverage. Id. at ¶ 287. Merolla also claims that in January of 2010, Eihab's Board of Directors approved a one-time lump sum payment of $14,500 to the pension accounts of certain long-term staff members. Id. at ¶ 289. Merolla, however, did not receive this benefit and was told, upon inquiry, that the payment had been withheld because Merolla "should not have reported [Abboud] to the State." Id.

DISCUSSION

Summary judgment is appropriate where "'the evidence, viewed in the light most favorable to the party against whom it was entered, demonstrates that there are no genuine issues of material fact and that the judgment is warranted as a matter of law.'" Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quoting Global Networks Commc'ns, Inc. v. City of New York, 562 F.3d 145, 150 (2d Cir. 2009)); see also Fed. R. Civ. P. 56(a). In deciding whether summary judgment is warranted, the Court must "resolve all ambiguities and draw all reasonable inferences against the movant." Delaney, 766 F.3d at 167 (quoting Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 79-80 (2d Cir. 2009)) (internal quotation marks omitted).

"In retaliation cases, courts must be mindful that a victim of retaliation is 'seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence.'" Quarless v. Brooklyn Botanic Garden Corp., No. 11-CV-5684 (CBA) (RER), 2014 WL 2767085, at *4 (E.D.N.Y. Jun. 18, 2014) (quoting Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991)). However, "summary judgment remains available

for the dismissal of [retaliation] claims in cases lacking genuine issues of material fact." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997)) (internal quotation marks omitted) (discussing fact-intensive discrimination cases); see also Abdu-Brisson v. Delta Air Lines. Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."). "A dispute about a 'genuine issue' exists . . . where the evidence is such that a reasonable jury could decide in the non-movant's favor." Delaney, 766 F.3d at 167 (quoting Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008)).

A. Termination in Violation of the Anti-Retaliation Provisions of the FCA and the New York FCA

Plaintiffs allege that Defendants terminated their employment in violation of the anti-retaliation, or "whistleblower," provisions of the FCA, 31 U.S.C. § 3730(h), and the New York FCA, N.Y. State Fin. Law § 191. "The whistleblower provision of the New York FCA is essentially identical in language and substance to its federal counterpart." Forkell v. Lott Assisted Living Corp., No. 10-CV-5765 (NRB), 2012 WL 1901199, at *13 (S.D.N.Y. May 21, 2012).

"Section 3730(h) of the FCA provides a right of action to whistleblower employees who are discharged, demoted or harassed for actions taken 'in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under [the FCA].'" Liburd v. Bronx Lebanon Hosp. Center, No. 07-CV-11316 (HB), 2009 WL 900739, at *9 (S.D.N.Y. Apr. 3, 2009), aff'd 372 Fed. Appx. 137 (2d Cir. 2010) (quoting Moor-Jankowski v. Bd. of Trs. of New York Univ., No. 96-CV-5997 (JFK), 1998 WL 474084, at *10 (S.D.N.Y. Aug. 10, 1998)). The section "was intended to protect persons who assist in the discovery and prosecution of fraud, because 'few individuals will expose fraud if

they fear their disclosures will lead to . . . retaliation.'" <u>Faldetta v. Lockheed Martin Corp.</u>, No. 98-CV-2614 (RCC), 2000 WL 1682759, at *11 (S.D.N.Y. Nov. 9, 2000) (quoting S. Rep. No. 99-345, at 34 (1986), <u>reprinted in</u> 1986 U.S.C.C.A.N. 5266, 5300).

In order to sustain an action for retaliatory discharge under the FCA and the New York FCA, each plaintiff must produce evidence establishing that (1) she engaged in conduct protected under the statute, (2) Eihab was aware of that conduct, and (3) she was terminated in retaliation for that conduct. <u>See</u> <u>U.S. ex rel. Mooney v. Americare, Inc.</u>, No. 06-CV-1806 (FB) (VVP), 2013 WL 1346022, at *8 (E.D.N.Y. Apr. 3, 2013) (citing <u>Johnson v. The Univ. of Rochester Med. Ctr.</u>, 686 F. Supp. 2d 259, 268 (W.D.N.Y. 2010)).

### 1. *Protected Conduct*

First, defendants argue that neither the March 17, 2009, report to the Wei Wei auditors, nor any subsequent action taken by Plaintiffs, constitutes "protected conduct" under the anti-retaliation provisions of the FCA and the New York FCA.

Under Section 3730(h) of the FCA, protected conduct is defined as "lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop . . . violations of th[e] [FCA]." 31 U.S.C. § 3730(h)(1). "The determination of whether conduct is 'in furtherance' of a[n] FCA action is guided by the legislative history, which states that '[p]rotected activity should . . . be interpreted broadly.'" <u>U.S. ex rel. Smith v. Yale Univ.</u>, 415 F. Supp. 2d 58, 102-03 (D. Conn. 2006) (quoting S. Rep. No. 99-345); <u>see</u> <u>also</u> <u>Mooney</u>, 2013 WL 1346022, at *9.

In order for her actions to qualify as protected conduct under the whistleblower provisions of the FCA and the New York FCA, "a plaintiff must at least demonstrate that . . . her investigation. . . . w[as] conducted with the purpose of exposing a 'fraud upon the government.'"

Smith, 415 F. Supp. 2d at 103 (quoting Moor-Jankowski, 1998 WL 474084, at *10); see also Liburd, 2009 WL 900739, at *10. "As such, courts have generally concluded that 'conduct in furtherance of an action under [the FCA]' will be interpreted as conduct that was *calculated to, or reasonably could lead to a viable FCA action*." Smith, 415 F. Supp. 2d at 103 (collecting cases) (emphasis added) (alteration in original). However, "a plaintiff does not need to know that her investigation could lead to a *qui tam* suit." Mooney, 2013 WL 1346022, at *9.

Therefore, in making this assessment, courts in this Circuit have required a plaintiff "to show a 'good faith basis', [sic] or an 'objectively reasonable basis', [sic] for believing that . . . she was investigating matters in support of a viable FCA case." U.S. ex rel. Sasaki v. New York Univ. Med. Ctr., No. 05-CV-6163 (LMM) (HBP), 2012 WL 220219, at *12 (S.D.N.Y. Jan. 25, 2012) (quoting Hoyte v. Am. Nat'l Red Cross, 518 F.3d 61, 67 (D.C. Cir. 2008)); see also Smith, 415 F. Supp. 2d at 103 ("Generally, when a potential plaintiff engages in an investigation in which it would be reasonable to conclude that there is a 'distinct possibility' that . . . she would find evidence of a[n] FCA violation, courts are inclined to find that the first prong of the analysis has been satisfied."). Notably, Section 3730(h) "protects an employee's conduct even if the target of an investigation . . . was innocent," and "proving a violation of [the FCA] is not an element of a § 3730(h) cause of action." Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 545 U.S. 409, 416 & n. 1 (2005).

Defendants argue that by Plaintiffs' own testimony, neither of them (1) did anything on March 17, 2009, that could possibly be construed as protected conduct under the FCA and the New York FCA, or (2) had a subjectively or objectively reasonable belief that Defendants were committing fraud against the government on March 17, 2009. The Court disagrees.

First, based on the record before the Court, a reasonable juror could conclude that Krause engaged in protected conduct when she reported to Merolla about Adelaja's claims that she had been asked to fraudulently recreate missing billing records. See Mooney, 2013 WL 1346022, at *8 (denying motion to dismiss where relator "sent a memorandum to her supervisors . . . describing incidents of medical record alteration and characterizing [these incidents] as 'clearly Medicaid fraud'"); Garcia v. Aspira of New York, Inc., No. 07-CV-5600 (PKC), 2011 WL 1458155, at *4 (S.D.N.Y. Apr. 13, 2011) (denying motion to dismiss where relator "raised the issue of 'the company's misuse of government funds'" with company executives and threatened "to take his complaints to the authorities"). Furthermore, a reasonable juror could conclude that Krause engaged in protected conduct by supplying information that initiated an investigation when she brought Adelaja to the Wei Wei auditors and spoke briefly with the audit team leader, Xiao, before letting Adelaja explain further. See, e.g., Sasaki, 2012 WL 220219, at *12 (finding question of fact on protected conduct where relator submitted complaint to Office of the Inspector General at the Department of Veterans Affairs alleging that hospital was defrauding the department); Smith, 415 F. Supp. 2d at 103 ("Courts have held that an investigation into fraudulent billing practices constitutes protected conduct under Section 3730(h).") (citing U.S. ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 740 (D.C. Cir. 1998)).

Merolla's conduct on March 17, 2009, is a closer call. But while Merolla did not herself report the suspected fraud or speak directly with the auditors, she did—as a supervisor receiving allegations of fraud from an employee in the midst of an agency audit—jointly decide, with Krause, to have Adelaja report to the Wei Wei auditors, for investigation. Furthermore, Merolla attended at least some of the resultant meeting with the auditors, thereby ensuring that the auditors were provided with the necessary information to pursue their investigation. See Sasaki,

2012 WL 220219, at *12; Smith, 415 F. Supp. 2d at 103; Bechtel v. St. Joseph Med. Ctr., Inc., No. 10-CV-3381 (MJG), 2012 WL 1476079, at *5 (D. Md. Apr. 26, 2012) (finding plaintiff, a physicians' assistant, had plausibly alleged that she acted in furtherance of a *qui tam* action where she "regularly 'pass[ed] along . . . information regarding" a hospital's alleged fraud to a doctor, who "in turn, would pass [this information] on to the United States in furtherance of the [FCA] case he filed"). This level of participation demonstrates more than just a passive role. Reporting to the Wei Wei auditors was a joint decision, and Krause and Adelaja's comfort in initiating the investigation clearly relied at least in part on the recommendation and support from Merolla that they do so. Therefore, given that the goal of Section 3730(h) is "to encourage any individuals knowing of [g]overnment fraud to bring that information forward," Merolla has raised a triable issue of fact concerning her alleged protected conduct on March 17, 2009. Forkell, 2012 WL 1901199, at *9.

Second, a reasonable juror could conclude that both Plaintiffs had a subjectively or objectively reasonable basis for believing that Defendants were committing fraud against the government on March 17, 2009. Defendants' arguments that this analysis somehow requires firsthand knowledge of the fraud on the part of Plaintiffs are unavailing. Neither of the cases that Defendants cited from the Second Circuit requires this level of certainty. Rather, both articulate the requirement as a good faith basis or objectively reasonable basis for *believing* that the defendants were committing fraud. See Weslowski v. Zugibe, 14 F. Supp. 3d 295, 311 (S.D.N.Y. 2014); Sasaki, 2012 WL 220219, at *12. And Elkharwily v. Mayo Holding Co., even if it were controlling, does not provide otherwise. No. 12-CV-3062 (DSD) (JJK), 2015 WL 468400, at *7 (D. Min. Feb. 5, 2015) (finding that plaintiff, who had formed his accusations after seeing unspecified billing codes in patient charts, "ha[d] no specific facts or information on which to

base his suspicion of billing fraud" and that "[u]nder these circumstances, [plaintiff] lack[ed] a good faith belief that fraud occurred").

On the date in question, Adelaja came to the Plaintiffs and told them that Eihab's executive director had asked her to recreate missing billing documents for the ongoing agency audit. Though Adelaja informed the Plaintiffs that she had refused to commit this fraud, Plaintiffs had no way of knowing whether any of the other Eihab employees had received and submitted to similar requests. By informing the auditors of this incident, Plaintiffs therefore alerted the auditors to the risk of fraud. And Xiao took this allegation seriously enough to begin an investigation which ultimately resulted in the rejection of some billing documents. Accordingly, Plaintiffs have provided sufficient evidence that, if proven, would permit a reasonable juror to conclude that Plaintiffs had a subjectively or objectively reasonable basis for believing that Defendants were committing fraud against the government on March 17, 2009.[2]

---

[2]    In addition to the March 17, 2009, report, Plaintiffs claim that they engaged in several other "protected acts" under the anti-retaliation provisions of the FCA and the New York FCA. As an initial matter, for all but one of the additional alleged protected activities, Plaintiffs' have not presented sufficient evidence, even when viewed in the light most favorable to Krause and Merolla, such that a reasonable juror could find that these additional alleged protected activities were "calculated, or reasonably could lead, to a viable FCA action," and were known to the Defendants. Smith, 415 F. Supp. 2d at 103.

The only additional protected activity that arguably supports a whistleblower claim is Merolla's complaint to Pennsylvania authorities about Lucke's time sheets. However, Plaintiffs' opposition brief made no attempt to address Defendants' arguments as to why this conduct could not support a whistleblower claim under the FCA and the New York FCA, and therefore this basis for their claims may be deemed abandoned. See Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."). Furthermore, though Plaintiffs' response to the Defendants' statement of undisputed facts discusses these alleged additional protected activities, it also clearly states that "Plaintiffs' FCA and [New York ]FCA retaliation claims are based on their reporting to the . . . auditors on March 17, 2009." Pls.' 56.1 Statement at ¶ 25.

Therefore, no matter what peripheral assertions of protected conduct Plaintiffs may have made, for the purposes of surviving Defendants' motion for summary judgment on the FCA and

### 2. *Defendants' Awareness of Plaintiffs' Conduct*

Plaintiffs have also raised an issue of fact regarding the Defendants' awareness of Plaintiffs' protected conduct.

Under Section 3730(h), Defendants must have known that Plaintiffs engaged in protected activity. Sasaki, 2012 WL 220219, at *12; Liburd, 2009 WL 900739, at *10. "Absent such notice, then, *a fortiori*, [Defendants'] actions could not constitute retaliation." Liburd, 2009 WL 900739, at *10 (quoting Faldetta, 2000 WL 1682759, at *13) (internal quotation marks omitted) (alteration in original).

Plaintiffs have presented a wealth of evidence from which a reasonable juror could conclude that Defendants were aware of Plaintiffs' March 17, 2009, meeting with the Wei Wei auditors, including (1) draft minutes from a meeting of the Eihab board of directors, in which Abboud is quoted as stating that she "should have fired . . . Merolla when she reported to the State that [Eihab] w[as] forging documents," (2) Hammad's statement, prepared for Eihab in August of 2009, summarizing her recollections of the meeting with the Wei Wei auditors, and (3) Abboud's own deposition testimony in which she stated that she had heard from Hammad and Bramwell that Krause and Merolla had made reports to the Wei Wei auditors. Therefore, based on the record before the Court, a reasonable juror could certainly find that Defendants were aware of Plaintiffs' meeting with the Wei Wei auditors and the accusations leveled against them therein.

---

New York FCA whistleblower claims, the Court deems the March 17, 2009, report to the Wei Wei auditors to be the only relevant protected conduct.

### 3. *Termination in Retaliation for Conduct*

Defendants argue that even if the other two elements are met, Plaintiffs cannot establish that they were terminated in retaliation for their protected conduct, because Defendants have provided legitimate, non-retaliatory reasons for Plaintiffs' termination.

The Second Circuit has held that to survive a motion for summary judgment after a defendant has proffered a legitimate, non-retaliatory reason for termination the plaintiff must raise a genuine issue of material fact as to whether the defendant's stated reason was a pretext for retaliation. See Liburd, 372 Fed. Appx. at 139. Though, in Liburd, the Second Circuit did not address the exact rubric for evaluating whether an adverse employment action occurred "because of" an employee's protected conduct, courts in this Circuit have interpreted Liburd as "implicitly endors[ing] the application of the McDonnell Douglas framework to Section 3730(h) claims." Forkell, 2012 WL 1901199, at *10. And other Courts of Appeals have "held that in the context of an FCA retaliation claim, the . . . McDonnell Douglas. . . framework provides a suitable methodology to guide this analysis." Id. (collecting cases). This Court agrees with the reasoning of these authorities and applies the McDonnell Douglas framework to Plaintiffs' retaliation claims under the FCA and the New York FCA.

Under the McDonnell Douglas framework, courts apply the following burden-shift: (1) the employee bears to the initial burden of producing evidence sufficient to support a *prima facie* case of retaliation; (2) then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; and (3) finally the burden shifts back to the employee to demonstrate that the employer's stated reason is a pretext for retaliation. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973); see also Forkell, 2012 WL 1901199, at *10.

a. <u>Prima Facie Evidence of a Causal Connection</u>

In order to present a *prima facie* case of retaliation under the <u>McDonnell Douglas</u> framework, "a plaintiff must adduce 'evidence sufficient to permit a rational trier of fact to find . . . that a causal connection exists between the protected activity and the [plaintiff's termination], *i.e.*, that a retaliatory motive played a part in the'" plaintiff's termination. <u>Kessler v. Westchester Cty. Dep't. of Social Serv.</u>, 461 F.3d 199, 205-06 (2d Cir. 2006) (quoting <u>Cifra v. Gen. Elec. Co.</u>, 252 F.3d 205, 216 (2d Cir. 2001)). "The requirements to establish a *prima facie* case" at this first stage "are 'minimal,' . . . and a plaintiff's burden is therefore 'not onerous.'" <u>Bucalo v. Shelter Island Union Free Sch. Dist.</u>, 691 F.3d 119, 130 (2d Cir. 2012) (internal citations omitted).

Plaintiffs provided evidence of a number of retaliatory statements made and actions taken against them, following their meeting with the Wei Wei auditors, including threats of termination, offers of raises in exchange for retractions, and deprivation of items necessary for the performance of Plaintiffs' job functions. Therefore, a reasonable juror could conclude that there was a causal connection between the protected activity and Plaintiffs' termination.

b. <u>Legitimate Nondiscriminatory Rationale</u>

Defendants, in turn, have offered legitimate, non-retaliatory reasons for Plaintiffs' termination. According to Defendants, Krause was fired for failing to follow OPWDD criminal background check regulations, which, if true, would form the basis for termination. <u>See</u>, <u>e.g.</u>, <u>Liburd</u>, 372 Fed. Appx. at 139 (affirming summary judgment for employer where employee violated employer's telephone usage policy). And Merolla was purportedly fired for two acts of misconduct—(1) a false wage violation report to the Pennsylvania Department of Labor, and (2) her role in the Lucke forged time sheets—either of which presents insubordination sufficient

to justify termination. See, e.g., Schnabel v. Abramson, 232 F.3d 83, 87-88 (2d Cir. 2000) (affirming summary judgment for employer in age discrimination retaliation claim where employee was terminated for "outright insubordination" and inept performance); Forkell, 2012 WL 1901199, at *11 ("[I]t is beyond dispute that an employer may terminate an employee based on . . . perceived insubordination . . . or disruptive behavior in the workplace.").

### c.   Pretext

"Under the McDonnell Douglas framework, after the defendant has articulated a non-retaliatory reason for the employment action, the presumption of retaliation arising from the establishment of the *prima facie* case drops from the picture." Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d. Cir. 2013) (citing Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000)). "[T]he plaintiff must then come forward with evidence that the . . . proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock, 224 F.3d at 42.[3]

At this third "pretext" step of the McDonnell Douglas framework, Plaintiffs argue that the Court should apply the so-called "mixed-motive" standard of causation, under which an employer is liable if its actions are motivated "at least in part" by retaliation, instead of the heightened "but-for" standard of causation. However, Plaintiffs' argument is weakened by Univ. of Tex. Sw. Med. Ctr. v. Nassar, in which the Supreme Court held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened" mixed-motive standard of causation. 133 S.Ct. 2517, 2533 (2013).

---

[3]    Defendants quote the district court Liburd decision to suggest that the Court's analysis should end at the second stage of the McDonnell Douglas framework. 2009 WL 900739, at *11 ("When an employer produces sufficient evidence to show a legitimate reason for a plaintiff's termination, there is no causal connection between allegedly protected activities and termination.") However, this position is undermined by the Second Circuit's decision in Liburd, noting that "defendants proffered a legitimate, non-retaliatory reason for [plaintiff]'s termination and [plaintiff] *failed to raise a genuine issue of material fact as to whether that reason was a pretext for retaliation*." 372 Fed. Appx. at 139 (emphasis added).

The Second Circuit has yet to address whether <u>Nassar</u> also applies to retaliation cases under the FCA. Nonetheless, the Court need not determine which standard of causation is appropriate here because, as discussed below, the Court concludes that Plaintiffs' FCA retaliation claims survive even under the heightened "but-for" standard of causation.

The heightened "but-for" standard of causation "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." <u>Kwan</u>, 737 F.3d at 845 (quoting <u>Nassar</u>, 133 S.Ct. at 2533). To satisfy this burden, "a plaintiff must produce 'not simply some evidence, but sufficient evidence' to support a rational finding that retaliation was the true reason for the adverse employment action." <u>Forkell</u>, 2012 WL 1901199, at *10 (quoting <u>Weinstock</u>, 224 F.3d at 42). "However, a plaintiff's [termination] can have multiple 'but-for' causes, each one of which may be sufficient to support liability." <u>Kwan</u>, 737 F.3d at 846 n.5 (collecting authorities). Therefore, requiring proof that Plaintiffs' protected conduct was a "but-for" cause of their termination "does not equate to a burden to show that such [protected conduct] was the 'sole' cause" of Plaintiffs' termination. <u>Id.</u>

Applying the "but-for" standard of causation, the Court concludes that Plaintiffs have raised a triable issue of fact as to whether "[D]efendants' stated reasons were pretextual and a retaliatory motive was the true impetus for their decision." <u>Forkell</u>, 2012 WL 1901199, at *12.

First, although Defendants rightfully point out that there is a lack of temporal proximity between the alleged protected conduct and Plaintiffs' termination—because both Krause and Merolla were terminated well over a year after the March 17, 2009, report to the auditors—"a court may overlook a longer gap in time between protected conduct and an adverse employment action where 'the pattern of retaliatory conduct begins soon after the [protected conduct] and only culminates later in actual discharge.'" <u>Billue v. Praxair, Inc.</u>, No. 05-CV-170 (JCH), 2007

WL 1231841, at *8 (D. Conn. Apr. 26, 2007), aff'd 2008 WL 4950991 (2d Cir. Nov. 20, 2008)

(quoting Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996)).

In this case, Plaintiffs have advanced evidence to demonstrate that Defendants took a number of actions reflecting a retaliatory animus against Plaintiffs during the period between the March 17, 2009, report and Plaintiffs' termination, including threats of termination, offers of raises in exchange for retractions, and deprivation of resources and documents necessary for the performance of Plaintiffs' job functions. And although a large portion of this evidence is Plaintiffs' own testimony, there are other supporting sources as well, such as (1) draft minutes from a meeting with Eihab's board of directors in which Abboud is quoted as stating that she "should have fired . . . Merolla when she reported to the State that [Eihab] w[as] forging documents," and (2) testimony from Bramwell about the development of two "factions" regarding missing documents for the audit, with Krause, Merolla, and Adelaja on one side, and Abboud on the other. Therefore, the arguable lack of temporal proximity between the alleged protected conduct and Plaintiffs' termination is not, in and of itself, lethal to the viability of Plaintiffs' retaliation claims.

Second, Defendants correctly note that Plaintiffs' zealous reporting of alleged improper activities at Eihab sometimes resulted in the Plaintiffs' speculation that they would be terminated for "whistleblowing" activities other than their March 17, 2009, report to the Wei Wei auditors. Indeed, as the Plaintiffs' many alternative grounds for protected conduct make clear, they had no qualms about reporting on Eihab and Abboud for any number of perceived infractions. But while Plaintiffs' penchant for crying wolf will likely be of interest to a juror assessing the sincerity of *this* claim, the Court cannot make credibility determinations at this stage and does not find that Plaintiffs' statements on the causes of their termination are so inconsistent that a reasonable juror

could not credit them. See Jeffreys v. City of New York, 426 F.3d 549, 554-55 (2d Cir. 2005); Kwan, 737 F.3d at 846 n.5 ("The determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact.").

Third, "[u]nder some circumstances, retaliatory intent may also be shown, in conjunction with the plaintiff's *prima facie* case, by sufficient proof to rebut the employer's proffered reason for the termination." Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001) (citing Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 149 (2000)).

Defendants claim that Krause was terminated for failing to follow OPWDD employment regulations regarding criminal background check procedures, as determined by an Eihab investigation that took place while Krause was on medical leave and unable to defend herself. Defendants state that the investigation began after the OPWDD raised an issue regarding fingerprinting records at an Eihab services site, but Krause notes that the auditors made no findings with respect to Eihab's criminal background check procedures in their limited fiscal review report and there is no evidence of any such issue being raised by the OPWDD. Additionally, Krause argues that the procedures she allegedly failed to follow may not have been required for the employees at issue. Furthermore, Merolla testified that the investigation into Krause's work only began after Abboud instructed Merolla to "find a reason" to fire Krause, and Merolla concluded that there was no basis to do so.

Merolla, on the other hand, was purportedly fired for two acts of misconduct: (1) a false wage violation report to the Pennsylvania Department of Labor, and (2) her role in the Lucke forged time sheets. Again, this termination followed an investigation that took place while

Merolla was on medical leave and unable to defend herself. But Merolla denies the conclusions of the investigation as to both incidents. As to the first incident, Merolla contends that Abboud had intentionally withheld the compensation—because she suspected the employees were billing personal gas mileage—and that Merolla did not know that the issue was corrected when she reported it. As to the second, Merolla argues that she had been instructed to investigate the Lucke matter but Abboud had denied her access to the necessary billing documents, a claim supported by an email Merolla sent to an official at the relevant Pennsylvania county agency, at the time.

The timing of the investigations that lead to Plaintiffs' terminations (while both Plaintiffs were out on medical leave) is undeniably suspect. And this bad timing, combined with Plaintiffs' evidence of other retaliatory acts taken against them prior to this leave, buttresses Plaintiffs' version of events sufficiently to raise a triable issue of fact as to the true reason for Plaintiffs' termination, despite the lack of temporal proximity between the protected conduct and the Plaintiffs' termination. See Kwan, 737 F.3d 845 (finding a reasonable juror could infer that the employer's non-discriminatory reason for the plaintiff's termination was pretextual, based in part on the discrepancies in the employer's explanation).

In sum, drawing all reasonable inferences in favor of Plaintiffs, they have provided sufficient evidence that, if proven, would permit a reasonable juror to conclude that Plaintiffs were terminated in retaliation for reporting to the Wei Wei auditors. Accordingly, Defendants' motion for summary judgment is denied, with respect to Plaintiffs' retaliation claims under the FCA and the New York FCA, in as far as those claims seek to impose liability on Eihab.

B.  FMLA Interference

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise," an employee's right to medical leave. 29 U.S.C. § 2615(a)(1). Although the Second Circuit has "not yet articulated or identified the standard for resolving" FMLA interference claims, "the majority of district judges in this Circuit have coalesced around the same standard . . . ." Museau v. Heart Share Human Serv. of New York, No. 12-CV-1851 (DLI) (MDG), 2014 WL 1277006, at *3 (E.D.N.Y. Mar. 27, 2014) (collecting cases). Namely, "[t]o establish a *prima facie* claim of interference with rights under the FMLA, a plaintiff must establish," amongst other elements, "that defendants denied her benefits to which she was entitled by the FMLA."[4] Id. (quoting Esser v. Rainbow Adver. Sales Corp., 448 F.Supp.2d 574, 580 (S.D.N.Y.2008)) (internal quotation marks omitted); see also Achille v. Chestnut Ridge Transp., Inc., 584 Fed.Appx. 20, 21 (2d Cir. 2014) (noting that the Second Circuit "ha[s] not set out the requirements of a *prima facie* case on a claim for interference with FMLA rights" but applying, for the purposes of the individual appeal, "the standard regularly employed by district courts of this Circuit for such claims").

"Fielding occasional calls about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise of an employee's FMLA rights." Reilly v. Revlon, Inc., 620 F.Supp.2d 524, 537 (S.D.N.Y. 2009) (granting summary judgment for employer and noting that calls do not interfere with an employee's leave where they are "limited to the scope of passing on institutional knowledge to new staff, or providing closure on completed assignments"); but see Zahler v. Empire Merchants, LLC, No. 11-CV-3163 (JG)

---

[4]     The other elements—that (1) Plaintiffs were eligible employees, (2) Eihab constitutes an employer, (3) Plaintiffs were entitled to leave, and (4) Plaintiffs gave notice to Eihab of their intention to take leave—are not at issue here. Id.

(CLP), 2012 WL 273698, at *9 (E.D.N.Y. Jan. 31, 2012) (denying employer's motion to dismiss where employer repeatedly called employee during her leave and "demanded that [she] use her computer to produce work product" for him).

In this case, Eihab's human resources department emailed Merolla during her medical leave about the investigation into the Lucke time sheets and requested that Merolla participate in the investigation either in person or by phone. Merolla responded, denying the allegations against her and objecting to being forced to participate in the investigation because she had not yet been cleared by her physician to work from home in any capacity. Merolla does not claim that Eihab initiated any further improper contact with her after this response.

This record, even viewed in the light most favorable to Merolla, does not support a finding that Defendants interfered with Merolla's ability to exercise her right to medical leave under the FMLA by requiring her to work from home. Certainly the email requesting that Merolla participate in an investigation into her alleged fraudulent conduct is not the sort of routine, transitional contact discussed in Reilly, 620 F.Supp.2d at 537, but neither is it an instance of repeated contact, requiring Merolla to produce work product, as in Zahler, 2012 WL 273698, at *9. And district courts in other circuits have found that employers did not interfere with their employees' rights under the FMLA by requiring them to work from home where the employers requested that the employees participate in investigations during their leave. See, e.g., Neumeyer v. Wawanesa Gen. Ins. Co., No. 14-CV-181 (MMA) (RBB), 2015 WL 1924981, at *19 (S.D. Cal. Apr. 24, 2015) (granting summary judgment to employer where employer advised employee of investigation into purported misconduct via letter and offered to allow the employee to answer questions relating to the investigation but did not contact the employee further during his leave when the employee declined to participate); Betts v. Montgomery College, No. 12-CV-

3802 (AW), 2013 WL 4478192, at *9 (D. Md. Aug. 16, 2013) (dismissing claim where employer's emails and letters "were brief, infrequent, and requested that [the employee] take steps to assist in an investigation that was initiated as a result of [the employee]'s complaints").

Merolla could have informed Eihab that she was unable to participate in the investigation during her medical leave and stopped there. That Merolla did nonetheless use her response as an opportunity to provide her side of the story is unsurprising. However, this unrequired defense cannot, in and of itself, convert the original request into an interference with Merolla's medical leave by requiring her to work from home. See, e.g., Museau, 2014 WL 1277006, at *4 (granting summary judgment to employer who emailed about a company meeting in part because employee could have responded "that she could not attend the meeting because [it] would occur during her FMLA leave").

Additionally, Plaintiffs' citation to Juarez v. Verizon Serv. Corp., 893 F.Supp.2d 1261 (M.D. Fl. 2012), to argue that conducting the investigation during Merolla's medical leave is a *per se* violation of her rights under the FMLA is unavailing. The interference claim in Juarez was based on an argument that the employer launched "frivolous and unwarranted investigations" against the employee (and also demoted her, upon her return to work) in order to *discourage* the employee from taking FMLA leave. 893 F.Supp.2d at 1269. In this case, however, Merolla's FMLA interference claim is based on the argument that Merolla was required to work during her medical leave, not that she was discouraged from taking it. In fact, Merolla makes clear her view that the investigation was launched not to discourage her from taking medical leave but in retaliation for her whistleblowing.

As such, Defendants' motion for summary judgment is granted with respect to Merolla's FMLA interference claim, as no reasonable juror could find that Defendants interfered with Merolla's ability to exercise her right to medical leave under the FMLA.

C.  ERISA Interference

Under Section 510 of ERISA, "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ." 29 U.S.C. § 1140. "Section 510 was designed primarily to prevent 'unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights.'" Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1111 (2d Cir. 1998) (quoting West v. Butler, 621 F.2d 240, 245 (6th Cir. 1980)). Accordingly, "an 'essential element' of this ERISA claim is that defendants were motivated by a specific intent to engage in activity prohibited by [Section] 510 so that the loss of benefits was not 'a mere consequence of, but . . . a motivating factor behind, a termination of employment.'" Gioia v. Forbes Media LLC, 501 Fed. Appx. 52, 54-55 (2d Cir. 2012) (quoting Dister, 859 F.2d at 1111). The Second Circuit applies the McDonnell Douglas framework to determine intent in Section 510 cases. Dister, 859 F.2d at 1111–13.

Plaintiffs have provided no evidence that Defendants terminated them for the purpose of interfering with their health or dental insurance coverage, and even if the Plaintiffs did lose health or dental insurance coverage as a result of their termination, there is no cause of action for this "mere consequence" of Plaintiffs' termination. Dister, 859 F.2d at 1111; see also Ekwegablu v. Cent. Parking Sys., No. 97-CV-9477 (MGC), 2000 WL 1371335, at *5 (S.D.N.Y. Sept. 22, 2000) (granting summary judgment to employer where employee lost pension benefits as a result

of his termination, but there was no evidence that the employer terminated him for the purpose of interfering with his pension benefits).

Additionally, although Merolla claims that she was unjustly denied a board-approved one-time lump sum payment of $14,500 to her pension account, Merolla has provided no evidence of the board's approval of such a payment, receipt of such payment by her coworkers, or Merolla's denial of this payment, outside of her own statements.

Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiffs' ERISA interference claim.

D.   Breach of Contract

Under New York law, "at-will" employment relationships can be lawfully terminated "at any time by either party." Cruz v. HSBC Bank, USA, N.A., 5 F. Supp. 3d 253, 256 (E.D.N.Y. 2014) (collecting cases). Additionally, "[w]here a manual or policy statement contains a disclaimer that nothing in the manual is intended to create a contract, an employee cannot bring a breach of contract claim based on the manual or policy statement." Sharkey v. J.P. Morgan Chase & Co., No. 10-CV-3824 (RWS), 2011 WL 135026, at *9 (S.D.N.Y. Jan. 14, 2011) (citing Baron v. Port Auth. of New York and New Jersey, 271 F.3d 81, 85-86 (2d Cir. 2001)). "[T]here is no exception for firings that violate public policy such as, for example, discharge for exposing an employer's illegal activities." Lobosco v. New York Tel. Co./NYNEX, 96 N.Y.2d 312, 316, 751 N.E.2d 462 (2001).

Eihab's Code of Ethics and Business Conduct ("Code of Ethics") contains a section on procedures to follow when reporting complaints under the FCA, which states that "[Eihab] policy strictly prohibits retaliation, in any form, against any individual making a report by internal or external mechanisms in good faith." Pls.' 56.1 Statement, Ex. 25 at 5.

However, Eihab's Employee Policy Manual, which "overrides and replaces all past [Eihab] handbooks, manuals, and policies," clearly explains that Eihab employment is "at-will." Id., Ex. 26 at 6, 38. And the end of the Employee Policy Manual contains a half page "At-Will Employment Agreement," stating that employees "understand and agree that [thei]r employment with [Eihab] is at-will, which means that [thei]r employment is for no definite period and may be terminated by [Eihab] at any time," and providing that the agreement "may not be modified or superseded except by written agreement signed by [the employee] and [Eihab]." Id. at 38.

Plaintiffs concede that they were employed "at-will" but cite dicta from Brady v. Calyon Secs. (USA), No. 05-CV-03470 (GEL), 2007 WL 4440926, at *5-6 (S.D.N.Y. Dec. 17, 2007), to support their claim that the anti-retaliation clause in Eihab's Code of Ethics constituted a contractual "express limitation" on Eihab's right to terminate their employment. However, "[e]ven if Plaintiff[s] had alleged the elements of a breach of implied contract claim under New York law, Plaintiff[s] cannot negate the express disclaimer of contractual rights contained" in Eihab's Employee Policy Manual. Sharkey, 2011 WL 135026, at *10 (dismissing breach of contract claim because unambiguous disclaimer in employee manual overrode non-retaliation policy). And Plaintiffs' attempts to distinguish Sharkey, by emphasizing that the non-retaliation policy in that case was located in the same manual as the disclaimer, are unavailing. See Ubal-Perez v. Delta Airlines Inc., No. 13-CV-2872 (SJ) (JMA), 2014 WL 223227, at *5-6 (E.D.N.Y. Jan. 21, 2014) (finding that a disclaimer in an employee manual was "fatal to plaintiff's breach of contract claim" based on language in a separate flight handbook, although noting that the plaintiff "appear[ed] to treat these documents as one singular document").

Therefore, the Court grants Defendants' summary judgment with respect to Plaintiffs' breach of contract claim.

E.   Personal Liability of Abboud

Finally, Plaintiffs assert that Abboud is personally liable for all of the above claims in her capacity as the chief executive officer and executive director of Eihab.

Courts in this Circuit have repeatedly held that there is no individual liability under the FCA and the New York FCA. See Monsour v. New York State Office for People with Developmental Disabilities, No. 13-CV-336 (TJM) (CFH), 2014 WL 975604, at *10-11 (N.D.N.Y. Mar. 12, 2014) (collecting cases). To the extent Plaintiffs argue that the Court should pierce the corporate veil and deem Abboud an alter ego of Eihab (and therefore an "employer" under the FCA), the Court finds that Plaintiffs have not sustained their heavy burden of demonstrating that Abboud exercised sufficient domination over Eihab to warrant such a result.

"It is well settled that New York courts are reluctant to disregard the corporate entity." William Wrigley Jr. Co. v. Waters, 890 F.2d 594, 600 (2d Cir. 1989) (citing cases). "The corporate veil will be pierced only when the corporate 'form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego.'" Bridgestone/Firestone, Inc. v. Recovery Credit Serv., Inc., 98 F.3d 13, 17-18 (2d Cir. 1996) (quoting Gartner v. Snyder, 607 F.2d 582, 586 (2d Cir. 1979)); see also Am. Fuel Corp. v. Utah Energy Dev. Co., Inc., 122 F.3d 130, 134 (2d Cir. 1997) ("New York law requires the party seeking to pierce a corporate veil to make a two-part showing: (i) that the owner exercised *complete domination* over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.") (citing Morris v. New York State Dep't of Taxation & Fin., 82 N.Y.2d 135, 603 N.Y.S.2d 807, 810–11 (1993)) (emphasis added).

"In deciding whether to pierce the corporate veil, courts look to a variety of factors, including the intermingling of corporate and [personal] funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, . . . siphoning off of funds . . . , and the inactivity of other officers and directors." OOO v. Empire United Lines Co., Inc., 557 Fed.Appx. 40, 46 (2d Cir. 2014) (quoting Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 195 (2d Cir. 2010)) (internal quotation marks omitted). However, application of these precedents to specific facts "can be difficult, particularly in the case of small privately held corporations where the trappings of sophisticated corporate life are rarely present." William Wrigley, 890 F.2d at 601.

It is certainly true that Eihab lacked a level of professional polish that would be desired from a well-run organization. The draft limited fiscal review reports pointed out a number of corporate deficiencies at Eihab, such as: (1) the board of directors failed to provide adequate fiscal oversight; (2) Eihab did not have a written policy and procedure governing loans to employees; (3) Abboud was able to sign off on checks for any amount without approval; (4) the board of directors approved a fifteen year employment contract (plus another fifteen years of automatic renewal) for Abboud in 2006, doubling her salary from $75,000 to $150,0000, without reviewing a market study; and (5) Medicaid checks were mailed to Abboud's home, who would then bring the checks to Eihab for deposit and bookkeeping purposes. Id., Ex. 18 (draft limited fiscal review report). However, none of these criticisms suggest that Abboud "controlled and dominated" Eihab to such an extent that Eihab, a multi-office, multi-employee non-profit with a board of directors, state audited finances, and millions of dollars in annual revenue, "'had no existence of its own.'" Physicians Mut. Ins. Co. v. Greystone Servicing Corp., Inc., No. 07-CV-10490 (NRB), 2009 WL 855648, at *4 (S.D.N.Y. Mar. 25, 2009) (noting that allegations of

"senior management responsibility" are not sufficient to meet this threshold); see also Am. Fuel, 122 F.3d at 134-35 (refusing to pierce corporate veil even though corporation had no contracts, employees, capital, or assets, was run out of its president's home, president shifted personal funds to company, and company loan guaranteed by president personally); Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp., 938 F.Supp.2d 361, 375-76 (E.D.N.Y. 2013) (granting plaintiff's summary judgment motion for veil piercing claim where two companies lacked "even the most basic corporate formalities," like a board of directors).

Plaintiffs also claim that Abboud hired at least two of her family members, stacked the Board with friends, and exerted control over the staff by threatening to fire employees whom she had sponsored for immigration. Id., Ex. 1 at 135-36; Affidavit of Jane Merolla, ECF No. 68, at ¶¶ 4, 9, 13. However, these accusations either are not clearly improper (such as that Abboud amassed allies on Eihab's board of directors) or are unsupported allegations (like that Abboud threatened employees' immigration status to force their compliance).

Thus, the Court concludes that the Plaintiffs have failed to set forth sufficient evidence to raise an issue of fact as to whether Abboud so dominated Eihab to warrant disregarding Eihab's corporate form. Accordingly, the Court grants Defendants' motion for summary judgment on Plaintiffs' claims under the FCA and the New York FCA, in as far as these claims seek to impose personal liability on Abboud.

Although the Court also questions whether there is any basis for personal liability in Plaintiffs' FMLA, ERISA, or breach of contract claims, the Court does not reach this issue, because the Court grants summary judgment to the Defendants on those claims.

<u>CONCLUSION</u>

For the reasons stated above, Defendants' motion for summary judgment is granted in part. The Court denies Defendants' motion for summary judgment with respect to Plaintiffs' whistleblower claims under the FCA and the New York FCA against Eihab but grants Defendants' motion in as far as those claims seek to impose personal liability on Abboud. Additionally, the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' FMLA, ERISA, and breach of contract claims.

SO ORDERED.

Dated: Brooklyn, New York
      August 4, 2015

                                   /s/ Judge Raymond J. Dearie
                                _____
                                RAYMOND J. DEARIE
                                United States District Judge